United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORTHERA, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTTSDALE INSURANCE COMPANY,<br><br>Defendant. | Case No.  14-cv-05014-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 43, 45 |

## I.    INTRODUCTION

Plaintiff Corthera, Inc. brought the instant suit against Defendant Scottsdale Insurance Co., alleging that Scottsdale breached its contractual obligation to reimburse Corthera for defense costs incurred in the case *Florey Institute of Neuroscience and Mental Health v. Kleiner Perkins Caufield & Byers*.  Docket No. 2-1 (Compl.).  Corthera indemnified a former officer, Mr. Thomas G. Wiggans, who selected Wilson Sonsini to defend him in the suit.  Corthera then sought to recover the costs of the defense from Scottsdale, based on a duty to defend policy.

The parties now move for partial summary judgment.  Scottsdale moves for summary judgment on the following issues: (1) whether the policy's No Voluntary Payment (NVP) provision applied to any fees and costs incurred by Corthera on behalf of Mr. Wiggans prior to January 23, 2014 (when Corthera first informed Scottsdale that Mr. Wiggans had retained Wilson Sonsini), (2) Corthera's bad faith claim, and (3) Corthera's claim for punitive damages.  Docket No. 45 (Scottsdale Mot.) at 1.  Corthera moves for partial summary judgment on whether the NVP provision applies to bar or limit Scottsdale's coverage.  Docket No. 43 (Corthera Mot.) at 1.

The parties' motions for partial summary judgment came on for hearing before the Court

on January 14, 2016.  For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part Scottsdale's motion for partial summary judgment, and **GRANTS** in part and **DENIES** in part Corthera's motion for partial summary judgment.

## II.      BACKGROUND

A.      The Indemnity Policy

Defendant issued Business and Management Indemnity Policy No. EKS3007550 to Plaintiff for the policy period July 31, 2009 to July 31, 2010 (hereafter, the Policy).  Docket No. 47 (Kolari Dec.), Exh. 1 (Pol.).  A six-year run-off period endorsement was later purchased.  At issue is the following provision:

> 2. The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

*Id.* at 021 (original emphasis).  Loss is further defined by the contract as "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Directors and Officers** under Insuring Clauses 1. or 2. or the **Company** under Insuring Clause 3."  *Id.* at 023, § B.7.  Costs, charges, and expenses are defined in relevant part as "reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** . . . ."  *Id.* at 022-23, § B.3.a.

The Policy places the duty to defend on the Insurer, not the Insured.  *Id.* at 027, § F.1. Furthermore, the Policy contains a No Voluntary Payment (NVP) provision which states:

> The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld.  The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented.  The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

*Id.* at 027, § F.3.

2

B.      The *Florey* Action

On December 21, 2012, the Florey Institute of Neuroscience and Mental Health (Florey) filed a lawsuit, naming (among others) former Corthera CEO and board member Stanley Abel and former board member Peter Breining as defendants.  Docket No. 46 (Request for Judicial Notice) (RJN), Exh. 1 (Florey Compl.).[1]  The complaint alleged that the defendants had violated Florey's intellectual property rights, related to the development and commercialization of a family of peptides known as relaxin or serelaxin.  *Id.* at ¶ 1.

By this point, Corthera had been acquired by Novartis Pharmaceuticals Corporation (NPC), who handled the assignment of defense counsel (hereafter, NPC and Corthera are collectively referred to as Corthera).  On April 4, 2013, Hogans Lovells LPC appeared in the *Florey* action on behalf of all defendants, including Mr. Abel and Mr. Breining.  RJN, Exh. 3.  On May 31, 2013, Corthera notified Scottsdale of the *Florey* action.  Docket No. 2-1 (Compl.) at ¶ 15.  On July 15, 2013, Corthera agreed to indemnify Mr. Abel and Mr. Breining, subject to the parties "agree[ing] on a fair allocation of the defense costs to be advanced."  Docket No. 43-1 (Osias Dec.), Exh. D.  Corthera informed Scottsdale the decision to indemnify Mr. Abel and Mr.

---

[1] Scottsdale requests judicial notice of: (1) the *Florey* complaint; (2) the complaint in the instant action; (3) Hogan Lovells's Notice of Appearance in the *Florey* action; (4) Hogan Lovells's motion to dismiss in the *Florey* action; (5) the September 26, 2013 court order regarding Hogan Lovells's motion to dismiss; (6) the *Florey* first amended complaint; (7) Wilson Sonsini's Notice of Appearance in the *Florey* action; (8) a stipulation to extend time for Mr. Wiggans to respond to the *Florey* first amended complaint; (9) Mr. Wiggans's administrative motion to set uniform hearing dates and suspend scheduling order dates in the *Florey* action; (10) Wilson Sonsini's motion to dismiss in the *Florey* action; (11) an order vacating all dates in the scheduling order in the *Florey* action; (12) Florey's Notice of Appeal; (13) an order of voluntary dismissal of the *Florey* appeal; and (14) the answer in the instant action.  RJN at 1-2.

> Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201.  We may take judicial notice of undisputed matters of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), including documents on file in federal or state courts.  *See Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002).

*Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012).  Here, Corthera does not dispute the accuracy of the documents, which are all readily verifiable documents filed in this district.  Judicial notice is therefore proper.

United States District Court
For the Northern District of California

Breining on July 29, 2013.  Kolari Dec., ¶ 6.  On August 7, 2013, Corthera informed Scottsdale that Hogan Lovells had been selected to represent all of the defendants, and that if coverage was determined, it would select that firm.  *Id.*, Exh. 3.  Corthera also noted that because there were multiple defendants, only two of which would be covered by the policy, the legal fees of Mr. Abel and Mr. Breining were expected to be significantly lower than if separate counsel had to be retained.  *Id.*  Thus, although Hogan Lovells charged up to $830 an hour, the arrangement was deemed favorable because the allocation of defense costs to Mr. Abel and Mr. Breining were 5.87% of the total charged by Hogan Lovells.  *Id.* at ¶ 8.  Scottsdale ultimately consented to the selection of Hogan Lovells for Mr. Abel and Mr. Breining.  *Id.* at ¶ 11.

On October 28, 2013, an amended complaint was filed in the *Florey* action, naming former Corthera directors Mr. Lowell Sears and Mr. Thomas G. Wiggans as defendants.  RJN, Exh. 6.  Although Mr. Sears could be represented by Hogan Lovells, Mr. Wiggans could not, due to a conflict-of-interest.  Osias Dec., Exh. I.  Mr. Wiggans requested indemnification from Corthera around November 1, 2013.  *See* Kolari Dec., Exh. 5.  On November 11, 2013, Corthera's counsel, Mr. Morgensten "confirmed that [Mr. Wiggans] was a director . . . and that, it can and will indemnify him on the same terms as it is indemnifying the other former officers/directors."  *Id.*

On December 9, 2013, Scottsdale issued a reservation of rights letter, explaining Scottsdale's analysis of coverage for the *Florey* lawsuit under the Policy.  Kolari Dec., Exh. 4.  The letter explained that the duty to defend was on Scottsdale, not the insured, and that "[w]ithin that duty is Scottsdale's right to appoint counsel to represent the Insureds' interests in connection with a potentially covered Claim."  *Id.* at 8.  It asked for information on whether Hogan Lovells would defend the newly named defendants, including Mr. Sears and Mr. Wiggans, and to explain how the parties planned to allocate the defense costs between the parties.  *Id.*  It also noted that if Scottsdale consented to Hogan Lovells, its consent would be subject to reasonable and necessary fees and expenses "consistent with the enclosed billing guidelines" and the "reservation of rights set forth within this letter," *i.e.*, the selection and appointment of counsel.  *Id.*  It requested further information to allow Scottsdale to evaluate the lawsuit.  *Id.*  The letter also called attention to Section F.3, the NVP provision, which required the insured not to incur any costs, charges, and

expenses without Scottsdale's prior written consent.  *Id.* at 7.  Invoking the NVP provision, Scottsdale disclaimed liability for fees or expenses incurred by Corthera prior to the date notice of the lawsuit was tendered to Scottsdale for coverage -- July 12, 2013.  *Id.* at 7-8.

Mr. Wiggans selected Wilson Sonsini as his defense counsel; Wilson Sonsini then sent Corthera a request for indemnification for Mr. Wiggans on December 17, 2013 by e-mail and letter.  Osias Dec., Exh. J.  Two days later, on December 19, 2013, Corthera responded to Scottsdale's December 9, 2013 letter and the request for information.  Kolari Dec., Exh. 5.  In this letter, Corthera included the November 11, 2013 Morgensten e-mail and explained: "I have attached the November 1, 2013 letter requesting indemnification from Mr. Wiggans and the November 11, 2013 Corthera/Novartis' affirmative email response."  *Id.*  Corthera did not attach or inform Scottsdale about Wilson Sonsini's letter of December 17 requesting indemnification. Instead, Corthera simply stated, "As soon as it is determined who will represent Mr. Wiggans, you will be informed and a copy of your enclosed billing guidelines will be forwarded to such law firm."  *Id.*

Wilson Sonsini litigated the *Florey* action on behalf of Mr. Wiggans starting on or around December 4, 2013.  *See* Kolari Dec., Exh. 8.  Scottsdale contends that it did not learn of Wilson Sonsini's retention until January 23, 2014, when Scottsdale forwarded a motion to dismiss filed by Wilson Sonsini.  Kolari Dec. at ¶ 9; *see also* Kolari Dec., Exh. 6.  Scottsdale responded that same day, stating that they would need to discuss the retention of Wilson Sonsini and noting that "[w]e do have plenty of firms in CA that are already on our panel and would likely be more cost effective for everyone . . . ."  *Id.* at Exh. 7.  Scottsdale alleges that it did not immediately inform Corthera of its decision not to consent to Wilson Sonsini because it believed that the motion to dismiss was set for hearing on February 21, 2014, and did not think that the *Florey* action would continue until a decision on the motion to dismiss was rendered.  Kolari Dec. at ¶ 13.

On February 20, 2014, Corthera responded to Wilson Sonsini's December 17, 2013 letter, agreeing it would indemnify Mr. Wiggans.  Osias Dec., Exh. K.  On February 28, 2014, Corthera sent Scottsdale a Wilson Sonsini invoice, charging $193,623.03 for services in December 2013. Kolari Dec., Exh. 8.  That same day, Scottsdale responded, explaining that it had not consented to

United States District Court
For the Northern District of California

Wilson Sonsini's retention, and noting that the services were rendered prior to Scottsdale's receipt of the January 23, 2014 e-mail explaining Wilson Sonsini's involvement. *Id.*, Exh. 9. It noted that the bill was "quite surprising," especially in comparison to the bills of the other insured defendants that have "totaled less than $30,000, over several months of defense work." *Id.* It stated that the bill did not appear reasonable, and expressed a desire to discuss the matter before Wilson Sonsini could bill any more time. It concluded: "In the meantime, Scottsdale will not recognize the Wilson Sonsini fees and expenses incurred in this matter without its consent (and which appear to be unreasonable) and reserves all of its rights with respect to this matter." *Id.*

On March 19, 2014, Corthera acknowledged receipt of Scottsdale's February 28, 2014 e-mail regarding non-consent. Kolari Dec., Exh. 9. It noted that it was negotiating a 10% discount, and asked Scottsdale to reconsider Wilson Sonsini as a defense firm for Mr. Wiggans. *Id.* On March 25, 2014, Scottsdale acknowledged the reduction but stated that it still found the amount significantly higher than the "hourly rates typically charged by Scottsdale's panel counsel and/or paid by Scottsdale for similar matters in similar geographic regions," and accordingly did not consent to Wilson Sonsini's retention. Kolari Dec., Exh. 11. After further e-mails with Corthera, on March 26, 2014, Scottsdale identified the rates charged by its panel counsel, Gordon Rees, and asked if Corthera would cover the difference between these rates and Wilson Sonsini's rates. Otherwise, Scottsdale stated its intent to appoint Gordon Rees to defend Mr. Wiggans, pursuant to its right and duty to defend. *Id.*

On March 27, 2014, Corthera informed Scottsdale that the *Florey* action was dismissed with prejudice. Osias Dec., Exh. Q at 5. It again asked Scottsdale to reconsider its decision not to process the Wilson Sonsini invoices for payment in light of Wilson Sonsini's successful motion to dismiss. *Id.* On April 17, 2014, Scottsdale stated that it was still considering the matter "and what, if any, it is willing to pay toward the Wilson Sonsini invoice given that it did not consent to Wilson Sonsini's defense at any point." *Id.* at 2. On April 18, 2014, Corthera sent Scottsdale the second invoice it had received from Wilson Sonsini, once again requesting reconsideration of the decision. *Id.* at 1. The invoice totaled $360,383.01. Kolari Dec., Exh. 12.

On April 23, 2014, Florey filed a notice of appeal. RJN, Exh. 12. Corthera informed

**United States District Court**
For the Northern District of California

Scottsdale of the appeal on April 25, 2014.  Osias Dec., Exh. H at 1.  On May 8, 2014, Scottsdale

informed Corthera that it would "keep with its earlier decision to assign Gordon Rees to defend

Mr. Wiggans in the appeal."  *Id.*  It further stated that it was still reviewing the Wilson Sonsini

invoices, and "will write separately to address the issues Scottsdale has with respect to any

reimbursement of those issues."  *Id.*  It also noted that it would be processing payment for the

portion of the Hogan Lovells fees apportioned to Mr. Abel, Mr. Breining, and Mr. Sears.  *Id.*

When Gordon Rees attempted to assume Mr. Wiggans's defense, it was informed that Mr.

Wiggans wished to be represented by Wilson Sonsini.  Kolari Dec., Exh. 14.

On June 10, 2014, Corthera again requested payment of the Wilson Sonsini invoices, and

stating that Scottsdale could not substitute Gordon Rees for Wilson Sonsini because "Scottsdale

has no right to remove Wilson Sonsini from Mr. Wiggans' defense."  Kolari Dec., Exh. 15.  It also

argued for the first time that Scottsdale's December 9, 2013 reservation of rights letter created an

actual and potential conflict of interest that gave "rise to the right to select independent counsel,

which Scottsdale must fund," thus "entitl[ing] Mr. Wiggans to independent defense counsel."  *Id.*

Scottsdale replied on July 8, 2014, disagreeing that the reservation of rights letter created an actual

or potential conflict of interest and explaining its conclusion.  Osias Dec., Exh. T at 1-6.  It also

cited the NVP provision, stating that because the costs had been incurred without its written

consent, "no coverage is available under the Policy for any fees or expenses incurred by [Wilson

Sonsini] in this matter."  *Id.* at 6.  However, Scottsdale stated that it was willing to pay a portion of

the "defense costs commensurate with what Scottsdale would have paid its panel counsel to

defend Mr. Wiggans in this matter," or approximately $28,000.  *Id.* at 6-7.  Scottsdale also

reiterated that it had appointed Gordon Rees and requested that Corthera and Mr. Wiggans

cooperate with panel counsel.  *Id.* at 7.

On July 29, 2014, Scottsdale followed up on its letter, asking for confirmation that Gordon

Rees would be permitted to engage in Mr. Wiggans' defense.  Kolari Dec., Exh. 17 at 2.  On

August 27, 2014, Scottsdale again followed up, noting that Gordon Rees was still not being

permitted to associate in the case and assume the defense of Mr. Wiggans.  *Id.* at 1.  It noted that

this refusal was a "violation of the terms of the Policy" and that "[a]ccordingly, Scottsdale must

continue reserving its rights to deny coverage for this matter with respect to Mr. Wiggans based on this breach of the terms of the Policy." *Id.* at 1-2.  Corthera filed the instant suit the following day.

### III.      DISCUSSION

A.      Standard of Review

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.  At the same time, "all reasonable inferences must be drawn in favor of the non-movant." *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party has the ultimate burden of proof, the moving party may prevail on a motion for summary judgment by pointing to the non-moving party's failure "to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

B.      No Voluntary Payment (NVP) Provision

"California law enforces . . . no-voluntary payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances." *Jamestown Builders, Inc. v. Gen. Star Indemnity Co.*, 77 Cal. App. 4th 341, 346 (1999); *see also Faust v. The Travelers*, 55 F.3d 471, 472 (9th Cir. 1995) ("California courts have consistently honored voluntary provisions").  The NVP Provision is "designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim." *Jamestown Builders, Inc.*, 77 Cal. App. 4th at 346; *see also Gribaldo, Jacobs, Jones & Assocs. v. Agrippina Versicherunges A.G.*, 3 Cal. 3d 434, 449 (1970) (noting that the purpose of a NVP provision "is to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims" [citation omitted]).  For that reason, a

8

**United States District Court**
For the Northern District of California

breach of a NVP provision requires no showing of prejudice before an insurer is allowed to avoid liability on the basis of an insured's breach, in contrast to a breach of a notice or cooperation clause in a policy. *Faust*, 55 F.3d at 472. "The existence or absence of prejudice to the insurer is simply irrelevant to its duty to indemnify costs incurred *before* notice. The policy plainly provides that notice is a *condition precedent* to the insured's right to be indemnified; a fortiori the right to be indemnified cannot relate back to payments made or obligations incurred before notice." *Low v. Golden Eagle Ins. Co.*, 110 Cal. App. 4th 1532, 1544 (2003) (internal citations and modifications omitted). "In short, the provision protects against coverage by fait accompli." *Jamestown Builders, Inc.*, 77 Cal. App. 4th at 346.

Scottsdale moves for summary judgment as to fees and costs incurred prior to January 23, 2014, the day that Corthera informed Scottsdale that Mr. Wiggans had retained Wilson Sonsini. Scottsdale Mot. at 2. It argues that those fees and costs were incurred without its written consent, as it had no opportunity to either give or deny its consent to Wilson Sonsini's retention. *Id.* Thus, Scottsdale contends that it has "no liability for sums incurred prior to January 23, 2014 as a matter of law," based on Corthera's breach of the NVP provision. *Id.* at 2-3.

Corthera responds with three arguments. First, it argues that the NVP provision is generally not applicable to the indemnity coverage because per its bylaws, it cannot legally control the defense of its officers and directors it is bound to indemnify. Corthera Mot. at 14. Second, it argues that even if the NVP provision applies, it did not "incur" the costs prior to January 23, 2014. Docket No. 50 (Corthera Opp.) at 3. Finally, Corthera argues that even if it did incur the costs prior to January 23, 2014, the costs were not incurred "voluntarily." *Id.* at 13. Corthera thus moves for summary judgment on whether the NVP provision bars or limits Scottsdale's obligation under the indemnification coverage. Corthera Mot. at 1.

     1.     <u>Applicability of NVP Provision</u>

The Court rejects Corthera's argument that the NVP provision should not apply to the indemnity coverage because it is "incompatible." Corthera Opp. at 11. At issue is a duty to defend per the insurance policy, which places the burden of defense on the insurer Scottsdale, not the insured. As explained by the California courts, notice to the insured as required by the NVP

**United States District Court**
For the Northern District of California

provision thus serves a function of allowing the insurer to promptly accept and take control over the defense and settlement of a claim. *See Jamestown Builders, Inc.*, 77 Cal. App. 4th at 346; *Gribaldo*, 3 Cal. 3d at 449. Corthera's assertion that it cannot control the defense of its officers and directors under Corthera's bylaws is a separate issue from whether Corthera had an obligation to *inform* its insurer, Scottsdale, prior to incurring any costs (including attorney's fees), thus giving Scottsdale this opportunity to consent or otherwise address the situation. Such notice has real potential utility: it affords the insurer and the insured (and its indemnitee) an opportunity early on to settle on selection of counsel. At the very least, notice would have given Scottsdale the opportunity to refuse consent but to negotiate a compromise such as partial reimbursement at lower rates before counsel proceeds to represent the insured.

Corthera cites no case law in support of its proposition that a NVP provision never applies to indemnity coverage because the insured's bylaws do not give indemnitor the ability to control the defense of its officers and directors. Instead, Corthera essentially argues that Scottsdale should be required to pay *any* costs incurred when it has an obligation to indemnify a director or officer; however, this would ignore the fact that under the Policy, the duty to defend is subject to a standard of reasonableness. *See* Pol. at § B.3.a. (defining costs as "reasonable and necessary legal costs, charges, fees and expenses incurred"); *Barratt Am., Inc. v. Transcon. Ins. Co.*, 102 Cal. App. 4th 848, 858 (2002) (whether an insured's expenses are reasonable and necessary is assessed under an objective standard). Moreover, the insurer's obligation cannot unilaterally be enlarged by the insured's obligation to indemnify its officers and directors, a matter governed by Corthera's bylaws and not the Policy. Under the Policy, Scottsdale retains the right to take over the defense once it assumes the duty to defend. The Court thus finds that the NVP provision does not defeat Corthera's reasonable expectations of coverage, and applies here.

2. "Incur" Definition

Next, Corthera argues that it did not "incur" any costs before January 23, 2014. Corthera Opp. at 3. While the parties agree that "incur" is defined by Black's Law Dictionary as "to suffer or bring on oneself (a liability or expense)," Corthera suggests that applying this definition results in four potential times when Corthera could be deemed to have incurred costs: (1) on the dates

United States District Court
For the Northern District of California

Corthera paid Wilson Sonsini's invoices; (2) on the dates Corthera received Wilson Sonsini's invoices; (3) on the date Corthera agreed to indemnify Mr. Wiggans; and (4) on the dates Wilson Sonsini performed each task for which it billed."  Corthera Opp. at 4; *see also* Docket No. 52 (Scottsdale Reply) at 1 (relying on Black's Law Dictionary definition of "incur").  Corthera argues that under any of the first three interpretations, it did not incur any costs before January 23, 2014, and that "[t]he fourth interpretation would result in an unreasonable construction of the Policy." Corthera Opp. at 4.

The Court finds that the cost is incurred when the task is performed because this is when the obligation to pay is created.  Corthera's argument that it only incurred costs when it actually paid Wilson Sonsini's invoices or when it received the invoice because it had the "option to pay nothing" is frivolous.  *See* Corthera Opp. at 4.  Corthera clearly had an obligation to pay for work performed; if Corthera had not paid, Wilson Sonsini would surely have a legal claim against it. Timing of receipt of the actual invoice is immaterial to incurrence of the obligation.

In response, Corthera suggests that finding that a cost was incurred when the service is performed would require an unreasonable construction of the Policy because "Corthera could conceivably be compelled to obtain consent from Scottsdale prior to performance of any minuscule task."  Corthera Opp. at 6.  There is no evidence that Scottsdale ever has or intends to apply the Policy in such a manner.  This argument is based on speculation.

Alternatively, Corthera forwards a third interpretation of "incur," which is that it did not incur costs until it agreed to indemnify Mr. Wiggans for Wilson Sonsini's defense work, *i.e.*, February 20, 2014.  Corthera Opp. at 5-6; *see also* Osias Dec., Exh. K.  However, there is indisputable evidence that Corthera had agreed to indemnify Mr. Wiggans as early as November, as reflected by the November 11, 2013 e-mail in which Corthera stated that "it can and will indemnify him on the same terms as it is indemnifying the other former officers/directors."  Kolari Dec., Exh. 5.  Corthera then informed Scottsdale that it had agreed to indemnify Mr. Wiggans, stating: "I have attached the November 1, 2013 letter requesting indemnification from Mr. Wiggans and the November 11, 2013 Corthera/Novartis' affirmative email response."  *Id.*  Thus, even applying Corthera's definition of "incur" to mean the date that Corthera agreed to indemnify

Mr. Wiggans, it would still have incurred costs prior to January 23, 2014, when it first informed Scottsdale that Mr. Wiggans had chosen to hire Wilson Sonsini.

The Court therefore finds that Corthera incurred costs prior to informing Scottsdale of the retention of Wilson Sonsini on January 23, 2014, in violation of the NVP provision.

### 3.     Voluntariness

Finally, Corthera argues that it did not "voluntarily" incur costs prior to January 23, 2014 because Corthera had a legal duty to indemnify Mr. Wiggans, and it could not select his counsel or control his defense. Corthera Reply at 6. In California, "'[e]ven if the policy contains a no voluntary payments provision, pre-tender expenses are not barred if they were incurred involuntarily.'" *Dietz Int'l Public Adjusters of Cal., Inc. v. Evanston Ins. Co.*, 796 F. Supp. 2d 1197, 1216 (C.D. Cal. 2011) (quoting *Tradewinds Escrow v. Truck Ins. Exch.*, 97 Cal. App. 4th 704, 710-12 (2002)). Voluntariness is generally a question of fact; however, when there is no genuine dispute of material fact, the voluntariness of unauthorized payments can be decided as a matter of law. *See Faust*, 55 F.3d at 473; *Dietz*, 796 F. Supp. 2d at 1216.

While courts have used expansive language in describing when a payment is incurred involuntarily, the courts have found involuntary payment in relatively limited situations. The two California cases that found involuntary payments both "concerned situations in which the insured's delay in tendering was allegedly due to difficulty locating the policy or identifying the insurer." *Dietz*, 796 F. Supp. 2d at 1218 fn. 114. For example, in *Fiorito v. Superior Court*, the plaintiffs were sued based on their alleged failure to disclose defects to the buyer of their home. 226 Cal. App. 3d 433, 436 (1990). Although they were served with the complaint in the summer, they did not tender defense of the action to their insurer until November. *Id.* The insurer agreed to defend, but refused to pay fees or costs incurred before November. *Id.* The Court of Appeal found there was a question as to the voluntariness of the plaintiffs' pre-tender expenses, based on the plaintiffs' allegations that they had retained counsel to protect their legal interests while they searched for their insurance policy. *Id.* at 438-39. Once they located and reviewed the policy, they promptly tendered the defense. *Id.* at 438. Thus, the Court of Appeal found that the costs incurred while the plaintiffs did not know the identity of their insurer could be involuntary.

Similarly, in *Shell Oil Co. v. National Union Fire Insurance Co.*, the Court of Appeal found that pre-tender payments were involuntary.  44 Cal. App. 4th 1633, 1649 (1996).  There, the plaintiff entered into a contract with an engineering company, which obligated the engineering company to defend and indemnify the plaintiff for any claims arising from the engineering company's work.  *Id.* at 1637.  One of the engineering company's workers suffered severe injuries while performing work under the contract, and sued both the plaintiff and the engineering company.  *Id.* at 1638.  The plaintiff was unaware of its insurer's identity and the contents of the policy until September 1987, at which point it sought coverage through counsel for the engineering company.  *Id.* at 1638, 1649.  When it did not receive confirmation of coverage, it formally demanded coverage and defense from the insurer in January 1988.  *Id.* at 1638.  The Court of Appeal agreed that under these circumstances, the pre-January 1988 expenses "cannot be characterized as voluntary."  *Id.* at 1649.

Outside of these two cases, the courts have generally rejected claims that costs were involuntarily occurred.  For example, in *Faust*, the plaintiff was sued by the Adizes Institute in federal court in November 1990.  55 F.3d at 472.  After a second lawsuit was filed against the plaintiff by the Adizes Institute, the plaintiff tendered defense of both suits to the insurer.  *Id.*  The insurer refused to reimburse the plaintiff for the pre-tender defense costs.  *Id.*  The plaintiff argued that the NVP provision should not bar payment because the urgency of the situation presented by the first lawsuit (including the Adizes Institute's requests for a temporary restraining order and preliminary injunction) prevented him from taking the time to tender defense of the action to the insurer.  *Id.* at 473.  The Ninth Circuit rejected this argument, finding that there was:

> no plausible reason for the more than four-month-long delay before the tender.  Even assuming [the plaintiff] had to immediately retain counsel to counter the TRO motion, [the plaintiff] offers no explanation for why it or its counsel could not have prepared and sent a tender letter to [the insurer] in the days or weeks following the filing and service of the first *Adizes* action.

*Id.*  Thus, no genuine dispute of material fact existed as to the voluntariness of the pre-tender costs, and the insurer was entitled to judgment on the issue as a matter of law.

Similarly, in *Jamestown Builders, Inc.*, the Court of Appeal rejected the argument that the

plaintiff's payments were involuntary.  77 Cal. App. 4th at 348.  The plaintiff was a developer who was sued by homeowners claiming that the houses built by the plaintiff were not watertight. *Id.* at 344.  Between June 1991 and June 1993, the plaintiff paid over a million dollars for repairs and damages, but never tendered its damages claim to its insurer during this period.  *Id.*  The plaintiff argued that its payment was involuntary because it was preoccupied with the magnitude of the remedial work, and because it did not know that the insurance policy would cover the expenses being paid.  *Id.* at 344-45.  The Court of Appeal rejected this argument, finding that the plaintiff "had ample time to review the policy, investigate the claims, and tender them to [the insurer].  Neither time nor events stopped [the plaintiff] from tendering its defense to [the insurer] before spending some $1,240,000 in settlements."  *Id.* at 348-49.  As to the argument that the plaintiff had not known the insurance policy would cover the expenses, the Court of Appeal stated: "Given its knowledge of the claims and the policy terms and conditions and the lack of any blameworthy conduct by [the insurer], [the plaintiff] should have found the facts.  It could not wait for the facts to find it."  *Id.* at 349.  Thus, the plaintiff's "ignorance of its policy rights does not extend the time in which it was required to take action."  *Id.*

Thus, the key is not the involuntary nature of the underlying obligation, but the involuntariness of not giving prior notice to the insurer as required by NVP clauses.  Corthera's argument that it did not voluntarily incur any costs because it was required to indemnify Mr. Wiggans by its bylaws, and could not control his defense, is besides the point.  With respect to costs incurred prior to January 23, 2014 (*i.e.*, when Corthera first informed Scottsdale about Wilson Sonsini's selection), the issue is whether there were extraordinary circumstances which prevented the insured from tendering the suit to the insurer (or otherwise notifying the insurer) until after costs were incurred.  In both *Fiorito* and *Shell Oil Co.*, the court found that there was an issue of fact as to voluntariness where the insurer did not know who its insurer was or could not locate the policy.  *See Fiorito*, 226 Cal. App. 3d at 438-39; *Shell Oil Co.*, 44 Cal. App. 4th at 1649.  Unlike those cases, Corthera was aware of who its insurer was and the terms of the policy, and had in fact previously requested indemnification for other directors and officers.  Corthera was even on notice that Scottsdale could invoke the NVP provision, as Scottsdale's December 9, 2013

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

reservation of rights letter specifically identified the NVP provision and disclaimed liability for fees or expenses incurred by the insureds prior to the date of notice of the lawsuit being tendered to Scottsdale for coverage (July 12, 2013).

There were no extraordinary circumstances that prevented Corthera from immediately informing Scottsdale that Mr. Wiggans had selected Wilson Sonsini as his counsel of choice after Corthera received the request for indemnification from Wilson Sonsini on December 17, 2013. Osias Dec., Exh. J.  In fact, two days after Corthera was informed that Wilson Sonsini had been retained, Corthera responded to Scottsdale's reservation of rights letter, attaching the e-mail in which Corthera confirmed that it would be indemnifying Mr. Wiggans.  Kolari Dec., Exh. 5. Rather than inform Scottsdale then that Wilson Sonsini had been selected as counsel, Corthera simply stated in that letter that it would inform Scottsdale who was representing Mr. Wiggans "as soon as it is determined." *Id.*  Corthera then failed to inform Scottsdale of Wilson Sonsini's selection until January 23, 2014, over a month later, and provides no explanation for its failure to do so.  Kolari Dec. at ¶ 9; *see also* Kolari Dec., Exh. 6.[2]

However, a different analysis is required for costs incurred on or prior to December 17, 2013, when Corthera received Wilson Sonsini's letter request indemnification for Mr. Wiggans. There is no evidence that prior to this letter, Corthera knew that Mr. Wiggans had retained Wilson Sonsini as counsel.  Instead, Corthera lacked knowledge of Mr. Wiggans's actions, which prevented it from notifying Scottsdale about the selection of Wilson Sonsini.  Under these circumstances, the costs incurred by Corthera prior to it gaining knowledge about the retention of Wilson Sonsini are involuntary.

---

[2] To the extent Corthera argues that Mr. Wiggans did not voluntarily incur any costs due to the need to comply with discovery and other deadlines in the *Florey* suit, the Court rejects this argument.  Again, the need to immediately defend did not prevent Corthera from informing Scottsdale about Wilson Sonsini's retention.  Furthermore, a similar argument was rejected in *Faust*, in which the Ninth Circuit found that pre-tender defense costs were not involuntary despite the plaintiff arguing that he had to immediately retain counsel to counter a TRO motion.  55 F.3d at 473.  As the Ninth Circuit pointed out, even if that was the case, there was still no explanation for why a tender letter was not sent to the insurer in the days or weeks following the filing and service of the action.  *Id.*  Thus, the fact that Mr. Wiggans had to quickly counter the lawsuit is not an extraordinary circumstance which renders the cost of his defense an involuntary payment for purposes of the NVP provision.

United States District Court
For the Northern District of California

1    Finally, Corthera makes a number of arguments for why Scottsdale should not be

2    permitted to apply the NVP provision for costs incurred after January 23, 2014.  Corthera Opp. at

3    9.  As an initial matter, Scottsdale has moved for summary judgment as to costs incurred *prior* to

4    January 23 only.  Scottsdale Mot. at 2.  As to amounts charged by Wilson Sonsini after January

5    23, 2014, the Court finds that there are questions of fact of whether the NVP provision bars

6    coverage because Scottsdale unreasonably withheld consent.  For example, there may be a

7    question of whether after receiving notice on January 23, 2014, Corthera was unreasonable in not

8    giving or denying consent until February 28, 2014, the day Corthera sent the first Wilson Sonsini

9    invoice.  *See* Osias Dec., Exh. K.  There may also be a question of whether Scottsdale

10    unreasonably withheld consent for Wilson Sonsini after Scottsdale approved similar rates for

11    Hogan Lovells's defense for other directors and officers, which Scottsdale justifies on the basis of

12    a favorable allocation of defense costs.  *See* Corthera Reply at 12-13; Kolari Dec., ¶ 8.  Thus,

13    summary judgment as to the applicability of the NVP provision for costs incurred after January

14    23, 2014 is not warranted.

15    The Court thus finds that the NVP provision applies to costs incurred between December

16    17, 2013 (when Corthera learned of Wilson Sonsini's selection) and January 23, 2014 (when

17    Corthera informed Scottsdale of Wilson Sonsini's selection).  The Court further finds that the

18    NVP provision does not apply to costs incurred on or prior to December 17, 2013, and that there is

19    a dispute of material fact as to whether the NVP provision could apply to costs incurred on and

20    after January 23, 2014.

21    C.    Bad Faith

22    Scottsdale moves for summary judgment on Corthera's claim for bad faith.  In general,

23    "[t]he law implies in every contract, including insurance policies, a covenant of good faith and fair

24    dealing."  *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007).  This:

25    implied promise requires each contracting party to refrain from
26    doing anything to injure the right of the other to receive the
         agreement's benefits.  To fulfill its implied obligation, an insurer
         must give at least as much consideration to the interests of the
27    insured as it gives to its own interests.  When an insurer
         unreasonably and in bad faith withholds payment of the claim of its
28    insured, it is subject to liability in tort.

*Id.* (quotation omitted).  Thus, to establish insurer bad faith under California law, a plaintiff must show that benefits due under the policy have been withheld, and that the reason for withholding benefits was unreasonable or without proper cause.  *See Allstate Ins. Co. v. Barnett*, No. C-10-0077-EMC, 2011 WL 2415383, at * (N.D. Cal. June 15, 2011) (citing *Dalrymple v. United Servs. Auto Ass'n*, 40 Cal. App. 4th 497, 512 (1995).

"As a close corollary of that principle, it has been said that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract."  *Wilson*, 42 Cal. 4th at 723.  However, "[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.  A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds."  *Id.*  A court may only grant summary judgment on a bad faith claim where it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable.  *Amadeo v. Principal Mut. life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002).  "[A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably."  *Id.*

In *Tomaselli v. Transamerica Insurance Co.*, the Court of Appeal found sufficient evidence to support a jury's finding of bad faith.  25 Cal. App. 4th 1269, 1280-82 (1994).  There, the insurer argued that it had conducted a reasonable investigation when it denied the plaintiffs-homeowners' claim, based on the plaintiffs' failure to timely bring the claim after they had noticed evidence of cracking in their house.  *Id.* at 1281.  The plaintiffs in turn pointed to evidence of bad faith, including the use of an "examination under oath" (EUO) at an early stage of the investigation, even though EUOs were ordinarily administered to investigate fraudulent claims.  *Id.*  The insurer misled the plaintiffs about the EUO, assuring them that it was a "simple procedure" to help settle the claim, dissuading them from having an attorney present, and failing to inform them that the purpose of the EUO was to search for information of policy violations.  *Id.*  There was also other indicia of bad faith, such as reliance on an endorsement that the plaintiffs had

17

said had not been sent to them, and which the insurer had not previously enforced against other policyholders. *Id.* The Court of Appeal found that while there could be innocent explanations for each of these indicia of bad faith, the jury could (and had) find that the handling and ultimate denial of the claim was unreasonable and in bad faith. *Id.* at 1282.

Corthera points to a number of indicators of bad faith. Of particular significance is what Corthera describes as Scottsdale's use of Gordon & Rees to "further [Scottsdale's] efforts to defeat coverage" when it asked panel counsel to project a budget of what its firm would have spent to prepare a motion to dismiss similar to the one filed by Wilson Sonsini. Docket No. 50-1 (Supp. Osias Dec.), Exh. B. This request occurred at the same time that Scottsdale was attempting to assign Gordon & Rees as Mr. Wiggans's counsel in the *Florey* case. A jury could find that there was no reason for Scottsdale to ask for this information other than to use it to defeat coverage, particularly when Scottsdale was requesting the information in July 2014, after the motion to dismiss had already been filed (and granted) and the case was on appeal. Corthera Opp. at 22-23. Once Gordon & Rees was appointed, the firm owed Mr. Wiggans "The same obligations of good faith and fidelity as if he had retained" the firm himself. Corthera Opp. at 22 (quoting *Lysick v. Walcom*, 258 Cal. App. 2d 136, 146 (1968)). Arguably, by using Gordon & Rees to provide information which could be used to deny coverage, this could have created a conflict of interest and thus demonstrate bad faith.

The Court finds there is a genuine dispute of a material fact preventing summary judgment on the bad faith claim.

D.     Punitive Damages

Finally, Scottsdale moves for summary judgment on Corthera's claim for punitive damages. Scottsdale Mot. at 22-23. In general, a breach of fiduciary duty without malice, fraud, or oppression does not warrant an award of punitive damages. *Tomaselli*, 25 Cal. App. 4th at 1287. Instead, punitive damages are only appropriate when the wrongdoer acts are appropriate if the insurer's acts "are reprehensible, fraudulent or in blatant violation of law or policy." *Id.* This is because:

> Both "malice" and "oppression" are defined in Civil Code section 3294 as involving 'despicable conduct," which in the case of malice "is carried on by the defendant with a willful and conscious disregard of the rights or safety of others," and as to oppression is "conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." ¶ "Despicable conduct" is defined in BAJI No. 14.72.1 (1989 Rev.) as "conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down up and despised by ordinary decent people." Such conduct has been described as having the character of outrage frequently associated with crime.

*Id.* at 1286-87 (citation omitted). In short, "[p]unitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." *Id.* at 1287.

In the insurance context, punitive damages have most commonly been assessed "where a showing has been made of a continuous policy of nonpayment of claims." *Id.* Thus, some California courts have suggested that "what [i]s required was 'a consistent and unremedied pattern of egregious insurer practices' in order for the insurer's 'bad faith' conduct to rise to the level of malicious disregard of the insured's rights so as to warrant the imposition of punitive damages." *Mock v. Mich. Millers Mutual Ins. Co.*, 4 Cal. App. 4th 306, 329 (1992) (quoting *Patrick v. Md. Cas. Co.*, 217 Cal. App. 3d 1566, 1576 (1990).

Applying these principles, the Court of Appeal in *Tomaselli* reversed the jury's award of punitive damages. First, it found that there was no showing that the inadequacy of the claim administration was part of a course of conduct. *Tomaselli*, 25 Cal. App. 4th at 1288. Next, it found that although there were facts sufficient to support a judgment for bad faith, those facts did not "add[] up to malice, oppression or despicable conduct." *Id.* In other words:

> the actions of [the insurer] may be found to be negligent (failing to follow up information provided by the insured), overzealous (taking an unnecessary deposition under oath of the insured), legally erroneous (relying on an endorsement which was not shown to have been delivered), and callous (failing to communicate). There was nothing done, however, which could be described as evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure. There is simply no evidence supporting a punitive damage award in this case, and the award must be reversed in its entirety.

*Id.* at 1289.

United States District Court
For the Northern District of California

Here, there is no evidence of such malice and oppression that would warrant punitive damages.  Corthera relies primarily on the assertion of the NVP provision, Scottsdale's July 8, 2014 offer to pay $28,000 to settle Wilson Sonsini's costs, and Scottsdale's decision to cover Corthera's indemnification of Mr. Abel, Mr. Breining, and Mr. Sears, but not Mr. Wiggans. Corthera Opp. at 25.  These facts, even if true, do not to rise to the level of malice and oppression required for punitive damages.  Even if they are legally erroneous, negligent, and callous, they do not rise to the level of being "evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure." *Tomaselli*, 25 Cal. App. 4th at 1288.  There is also no evidence that there was a pattern of denials; instead, the fact that Scottsdale *did* cover Corthera's costs of the other directors demonstrates that such a pattern does not exist.  Scottsdale offered to defend Mr. Williams with a well-established and reputable law firm, or to partially reimburse Corthera at that firm's rates.  Whether that discharged Scottsdale's obligation will be a matter for trial; these facts, however, do not warrant punitive damages.  Thus, the Court grants Scottsdale's motion for summary judgment on the issue of punitive damages.

## IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** Scottsdale's motion for partial summary judgment as to the application of the NVP provision for costs incurred after December 17, 2013 and prior to January 23, 2014, and on the issue of punitive damages.  The Court **DENIES** Scottsdale's motion as to the application of the NVP provision for costs incurred on or prior to December 17, 2013, as well as the bad faith claim.  Finally, the Court **DENIES** Corthera's motion for summary judgment, except on the limited issue of the application of the NVP provision for costs incurred on or prior to December 17, 2013.

**IT IS SO ORDERED**.

Dated: January 22, 2016

_____
EDWARD M. CHEN
United States District Judge

20