**Pages 1 - 27**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| CORTHERA, INC., et al., )<br><br>          Plaintiffs,      )<br><br>   VS.                    )<br><br>SCOTTSDALE INSURANCE COMPANY, )<br><br>          Defendant.      )<br>_____ ) | NO. C 14-05014 EMC |

San Francisco, California
Thursday, January 14, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

> MCCARTER & ENGLISH LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, New Jersey  07102
> **BY:  BRIAN J. OSIAS**
> **ATTORNEY AT LAW**
>
> FARELLA, BRAUN & MARTEL LLP
> Russ Building
> 235 Montgomery Street
> San Francisco, California  94104
> **BY:  KAREN P. KIMMEY**
> **ATTORNEY AT LAW**

For Defendant:

> SEDGWICK LLP
> 333 Bush Street - 30th Floor
> San Francisco, California  94104
> **BY:  BRIAN DAVID HARRISON**
> **ATTORNEY AT LAW**

Reported By:       Rhonda L. Aquilina, CSR #9956, RMR, CRR
                   Official Court Reporter

**Thursday - January 14, 2016**                      **2:35 p.m.**

                      **P R O C E E D I N G S**

                           **---000---**

THE CLERK:  Calling case C 14-5014, Corthera versus Scottsdale Insurance Company.

    Counsel, please come to the podium and state your name for the record.

    MR. HARRISON:  Good afternoon, Your Honor.  Brian Harrison appearing on behalf of the defendant Scottsdale Insurance Company.

    THE COURT:  All right.  Thank you, Mr. Harrison.

    MR. OSIAS:  Good afternoon, Your Honor.  Brian Osias on behalf of the plaintiffs for McCarter & English.  I'm also here with co-counsel Kerry Kimmey from Farella, Braun & Martel.

    THE COURT:  All right.  Good afternoon.  Okay.  We have cross-motions for partial summary judgment in this matter, and I think the first thing I want to discuss is the no-voluntary payment provision.

    First of all, I will say that there are several arguments, but I don't find that the question of when something is incurred, when a cost is incurred to be that complicated.  It seems to me that it's incurred when the service is performed, and there is an obligation to pay based on presumably a contractual understanding, so it's incurred not when the bill is sent, or it's incurred when money is incurred, when it's

owed, and the obligation is incurred, so --

**MR. OSIAS:**  Well, except, Your Honor, this is one step removed.  If I may.  Mr. Wiggans decided who to select as his counsel.  He was sued.  He decided who to select as his counsel.  He decided he was going to select Wilson, Sonsini as his counsel.  This was a serious lawsuit.  Hundreds of millions of dollars are at issue in this lawsuit.  He decided that he wanted Wilson, Sonsini as his counsel.  Corthera did not decide that.  Corthera did -- Corthera had no control over that decision.  Corthera could not tell Mr. Wiggans not to select Wilson, Sonsini.  They cannot control the defense.

And the costs, as you said, were incurred at that time vis-a-vis Wilson, Sonsini and Mr. Wiggans, but we had no control over that decision.

**THE COURT:**  How did that affect when it's incurred by -- the question is when is it incurred by Corthera?

**MR. OSIAS:**  Well, Corthera didn't decide formally to indemnify Mr. --

**THE COURT:**  Well, but you argue in other parts of your papers that they had an obligation to indemnify --

**MR. OSIAS:**  They did.

**THE COURT:**  There were no if, ands or buts, and they had no power to veto counsel choice, et cetera, et cetera.  So as known as -- as soon as Mr. Wiggans incurred it, Corthera incurred it.

**MR. OSIAS:**  Well, if you agree with the argument that there's no if's, ands, or buts, and Corthera had to indemnify him, which is true under the bylaws -- I don't even think it's contested -- then we don't need to get into when the cost was incurred.

**THE COURT:**  Well, I'm just saying to the extent there's an argument here about timing, it seems to me at the end of the day we're talking about costs that were incurred.  I guess the magic date is --

**MR. OSIAS:**  Corthera incurred -- I'm sorry to interrupt, Your Honor.

Corthera incurred the cost at the time that it agreed to indemnify.  It still undertook an analysis.  All that was taking place.  We weren't monitoring or telling Mr. Wiggans what Wilson, Sonsini should be doing and when and how much and how many people should be involved, and so forth.  That was all being done between Mr. Wiggans and Wilson, Sonsini.  They were defending --

**THE COURT:**  Right.  By virtue of the bylaws, Corthera incurred a legal liability at that point when the cost was incurred -- whenever it was incurred by Mr. Wiggans, it was incurred by Corthera, put it that way.

**MR. OSIAS:**  Okay, Your Honor.

**THE COURT:**  It seems to me.  And any argument on voluntariness -- you know, the questions about voluntariness,

not whether it's voluntary to indemnify or walk away from indemnity, the question is was there an opportunity to fulfill the notice provision under the MVP, and there are cases that say sometimes there was a certain emergency, there was no way to do it earlier, that's when it's involuntary.  The involuntariness has to do with giving advance notice, not whether you can avoid the obligation all together.  And here, I don't see an argument why there wasn't -- why it should be deemed involuntary here.

MR. OSIAS:  Well, because we had no control over Mr. Wiggans.

THE COURT:  Right.  And then you can explain that to Scottsdale:  You had no control, here's what Wiggans has done, he selected Wilson, Sonsini, here's the deal.

MR. OSIAS:  Well, how could we have -- how does the indemnification work then?  I mean, how does the indemnification coverage work?  That's something that's missing from the papers, and that's where I was going to start off here, if I could.  Then the indemnification coverage is no different from the coverage for the directors and officers directly.  I mean, we had no control over Mr. Wiggans and who he would select and what they would do to defend the case.

If we had told -- it's really irrelevant the timing.  The timing should be irrelevant.  If we had told -- if we had told Scottsdale that Wilson, Sonsini -- just a simple act - Wilson

Sonsini is counsel - Scottsdale would have done what it did and refused.  In fact, they did have an opportunity to consider and consent, because they failed to consent.  They failed to consent to Wilson, Sonsini.  The date of the notice is really --

THE COURT:  Well, you're saying the notice is irrelevant.  Why even give pre notice if there's an obligation, unconditional obligation identifying Mr. Wiggans, regardless of who he selects, regardless of the costs of counsel, and that obligation is owed, then Scottsdale owes the obligation hence, and therefore there's no -- it's not just timing is irrelevant, you're saying the whole notice, the advance notice provision is irrelevant.

MR. OSIAS:  They did have notice.  They had notice.

THE COURT:  You're saying this wouldn't have happened anyway, notice is irrelevant; right?  What's the purpose of notice?

MR. OSIAS:  Well, notice -- the notice -- well, first of all, there's no doubt that this is a post tender and there was notice and Scottsdale was on notice of the claim in general.

THE COURT:  Okay.  What's the purpose of advance notice?

MR. OSIAS:  Normally, the notice comes into play where Scottsdale -- and Scottsdale claims that it has a duty and

right to defend --

THE COURT:  And they could do something about it. They can help find counsel that they choose, they can negotiate with your counsel that you would like, you know, work out a deal, that's the purpose of advance notice; right?  You don't just encourage without the insurer knowing about it and say, *oh, by the way, here's the bill*.  You tell them in advance so they can get their ducks in a row and figure out what they're going to do.

MR. OSIAS:  Right.

THE COURT:  So it has a function.

MR. OSIAS:  Yes.  But I think there is a little bit of confusion here, because normally when the notice comes into play, there is a carrier ready, willing, and able to defend and does defend and comes in to defend the claim.

Here, that didn't happen.  They said, *okay* --

THE COURT:  I understand you're saying it couldn't happen because Mr. Wiggans had a right to choose his own counsel.  And even if Scottsdale said no, no, no, no, no, I want you to use X, not Y --

MR. OSIAS:  Which they did.

THE COURT:  Okay.  That's why I ask.  So you're saying that there's really no purpose under these circumstances to advance notice to the insurer, because they couldn't do anything anyway.

**MR. OSIAS:**  I don't think that's true, because they can still monitor the case, they can still be apprized of what's happening, and have input.

**THE COURT:**  All right.  Well, let me ask you, I mean, if their obligation -- if Corthera was obligated to provide indemnification and essentially pay for whomever, they have no choice in selecting counsel for Mr. Wiggans, what's the function of notice here, advance notice?  Why should the MVP come into play?

**MR. HARRISON:**  Well, the case law speaks to that, Your Honor.  And, I mean, the no-voluntary payments provision is built in to give protection to the insurer to prevent collusion, and also to give the insurer control over the management of the potential exposure of the claim.  And it's -- you know, the carrier needs to have notice of the claim so it can monitor the claim, manage the cost, exposure, expense, it has the right to appoint counsel under the duty to defend.

**THE COURT:**  So how about with the interplay here, we have the bylaws that say there's a duty to -- unconditional duty to indemnify Mr. Wiggans by Corthera, the insurer, and furthermore, Mr. Wiggans gets to choose his own counsel.  So what power does Scottsdale have under those circumstances?

**MR. HARRISON:**  Well, the policy is a liability policy, and it does insure certain losses, but it doesn't insure all risks that Corthera incurs.  The risks that it insures is based

on the language and the insuring clause, as well as exclusions and definitions within the policy, in particular at issue in this case is the definition of loss.  Loss does not cover everything.  If you look at the definition of loss, it excludes penalties and fines, it excludes matters that are not insurable under law, in this case California.  It doesn't provide insurance for non-monetary relief.  And with respect to charges and expenses, defense costs in this case, it's limited to those that are reasonable and necessary.

So Corthera doesn't -- it didn't purchase a policy that provides coverage for unlimited risk.  It purchased a policy where the risk is defined under the terms of the policy.  The fact that it entered -- it may have drafted some bylaws a long time prior to the policy being at issue, and intended to provide broad coverage under its bylaws for its directors and officers, probably because it wanted to attract the most qualified directors and officers to serve on its board or to manage its company, doesn't mandate that Scottsdale has to insure that entire risk.

**THE COURT:**  Okay.  So what -- how was Scottsdale prejudiced by not getting advance notice that Wilson, Sonsini was being retained?  It didn't get notice until January 23, 2014; right?

**MR. HARRISON:**  Right.

**THE COURT:**  And already some costs had been incurred.

**MR. HARRISON:**  Yes.

**THE COURT:**  Had they gotten notice from the get-go --

**MR. HARRISON:**  Right.

**THE COURT:**  -- what could Scottsdale have done to protect its interest?  What's the value to Scottsdale getting this advance notice?

**MR. HARRISON:**  Well, the immediate value would be $193,000 in defense costs that were incurred as a result of all the work done by Wilson, Sonsini in December of 2013 when Corthera knew on December 17th, 2013 that Wilson, Sonsini was representing Mr. Wiggans.  Scottsdale could have stepped in right at that point in time and said:  *We have concerns with Wilson, Sonsini representing Mr. Wiggans.  We have panel counsel in San Francisco, Gordon & Rees, who is qualified and capable to do the same work at the same quality at rates that are much more favorable to both the insured and to Scottsdale,* and could have taken steps at that point in time to --

**THE COURT:**  Okay.  I understand how that works in a typical situation where you're just defending the insured. What happens when the person being defended is an indemnitee of the insured and has some kind of contractual right, I guess, I don't know if it's a bylaw right or a contractual right to select their own counsel, would Scottsdale have been able to -- what leverage, what influence, how does that play out when you insure A, A indemnifies B, and says B can choose whatever

counsel it wants, but the insurer says *no, no, no, we don't want you to hire that counsel, we want you to hire this counsel,* how does that play out?

MR. HARRISON:  We have a contract with Corthera, and we have an obligation to perform per the terms of the contract. If it turns out that that contract, the scope of the coverage is not as great as whatever agreement was reached between Corthera and its officer, Scottsdale doesn't have an obligation to go beyond the scope of what the language of the policy says in terms of paying indemnification.  There's nothing under the California law or in the terms of the policy that --

THE COURT:  Yeah, and I'm not saying Scottsdale is bound to pay the full bill of Wilson, if that's what's going to be litigated here if this case doesn't resolve.  What I'm asking is what's the value of the advance notice and why the ability to invoke the MVP here?  Because normally you can say because we needed to know, because we would have had a chance to bring in our own counsel, somebody -- panel counsel like Gordon & Rees.  And I'm saying, well, could you have done that here when you're two steps removed?

MR. HARRISON:  I think we have -- under the policy, yes, we have the right to appoint counsel.

THE COURT:  Or maybe, more accurately, you had the right to tell Corthera you weren't going to get -- *you can go ahead and indemnify Mr. Wiggans, but you're not going to get*

*the full indemnification from us, so you might want to talk to them.*

**MR. HARRISON:**  Right.

**THE COURT:**  Is that the idea?

**MR. HARRISON:**  Yes.

**THE COURT:**  So something could have been --

**MR. HARRISON:**  Yes, that is --

**THE COURT:**  You could have made clear your position so that Corthera didn't -- wasn't just going to be conduit, that they're going to have some skin in the game.

**MR. HARRISON:**  That is correct.  That's correct.

**MR. OSIAS:**  Except, Your Honor, as things played out here -- two things.  As things played out here, when they found out on the 23rd about Wilson, Sonsini, Corthera got a response in return that didn't say no, you know, we don't want you to use Wilson, Sonsini, you can only use a panel counsel firm. What it said is perhaps there could be someone more cost-effective.  It listed Gordon & Rees and a panel counsel firm.

Then over the next several months there was a back and forth, back and forth, back and forth about whether or not Wilson, Sonsini could go forward, what they would pay, how much.  Ultimately, one day before Wilson, Sonsini obtained a dismissal of the entire case, that's when Scottsdale came in and said, *okay, now we're going to appoint Gordon & Rees*, one

day before.

So here, they still haven't -- there were six briefs mostly on this issue.  What's not in the papers is anything about how this can reasonably work.  I'll read to you the insuring clause, the second insuring clause:  "The insurer shall pay the loss," and loss -- I'm not sure where Mr. Harrison a going about cost, but loss does include defense costs.

THE COURT:  Reasonable.

MR. OSIAS:  Reasonable defense costs.  We're not here talking about reasonableness.  They still have the right to say it was too much, *that was too much*, and they have said that, *and we're not going to be responsible to pay all of that*.

THE COURT:  And that may be an issue in dispute.

MR. OSIAS:  And that may be an issue in dispute.

THE COURT:  Right.

MR. OSIAS:  But here we're talking about liability. They're trying to get out of coverage entirely.  They're trying to knock us out entirely.  Their brief is aimed at the period prior to January 25th.

THE COURT:  All right.  But we're getting away -- I had a simple question, and that is you say that the MVP provision is simply not applicable, has no utility here, is in conflict with the idea of indemnification.

MR. OSIAS:  Indemnification coverage.

**THE COURT:**  And I'm saying here, I don't see it.  I don't see why what's being encouraged by the MVP is advance notice to the insurer so that the insured can take some steps.  This case is a little more complicated, because it's not your typical steps you would take by stepping in and saying *we have the duty to defend, and we're going to defend, and we're going to hire Gordon & Rees, we're not going to hire Wilson, Sonsini*.

Here, it's not so simple to do that.  Nonetheless, so long as there's some potential utility in doing so, non -- the no-voluntary payments provision, which means you don't make payments in advance of informing the insurer, ought to apply.

**MR. OSIAS:**  We would have been in exactly the same position we are here.  They refused to accept Wilson, Sonsini.  They refused to accept --

**THE COURT:**  Is that a defense to failure to comply with the MVP of the notice provision?

**MR. OSIAS:**  Our only choice here was to -- and I don't think that we did fail to comply.  Because we didn't formally agree to indemnify until after the MVP -- excuse me.  We didn't formally agree to indemnify until February 20th, which was after the January 25th date.  That's when the notice went out to Wilson, Sonsini.  Wilson, Sonsini asked, on December 17th.  On February 20th, we, Corthera said, you know, we've looked at everything, we looked at the bylaws, we looked at the complaint, we looked at the allegations, and there is an

obligation to indemnify.  That's when we -- and they were on notice at that point.  They already told us that they, you know, had some concerns.  Then once they got the bill eight days later, or thereabout, they invoked the non-voluntary payment provision for the first time, because they thought the bill was excessive.  Now, they still get to argue that the bill is excessive, but they shouldn't get to invoke the non-voluntary payment provision to knock us out completely.

And we had a choice.  We could have said:  *We're not indemnifying you.  You don't get Wilson, Sonsini.  If you want to -- if you want coverage here, then you have to take whoever Scottsdale gives you and let Scottsdale run the defense, that's what they're going to pay for, and they've indicated that it's going to cost about $28,000.  We'll give you $28,000 to conduct your defense*.  We could have done that and breached our obligation to Mr. Wiggans.

**THE COURT:**  Well, what's Scottsdale's argument to -- when should notice have been given?

**MR. HARRISON:**  With respect to Wilson, Sonsini we should have received notice on December 17, 2013 when Corthera received notice that Wilson, Sonsini was representing Mr. Wiggans.  The claim that Corthera did not agree to indemnify Mr. Wiggans until February of 2014 is flat wrong.  There's no dispute, at least certainly not in the papers, that it was on November 11th of 2013 in which Corthera's counsel

wrote to the firm that wrote on behalf of Mr. Wiggans that it can and will indemnify Wiggans on the same terms as if it is indemnifying the other former officers and directors.  That's the Kolari declaration, paragraph 10 in Exhibit 5 attached thereto.

It wasn't until over a month later that --

THE COURT:  So what we're talking about are fees incurred between December 17th when Wilson was, say, retained -- you just gave me the December, is that right, December 17?

MR. HARRISON:  You asked when should Corthera have given notice to Scottsdale?

THE COURT:  Right.

MR. HARRISON:  And they had represented that they would do so as soon as possible in their December 19th letter.  But they had notice on December 17th, at least the record shows that they had notice on December 17th when Wilson, Sonsini wrote to Corthera's counsel.  The record shows that Mr. Wiggans had already retained Wilson, Sonsini for a couple of weeks prior to that.

THE COURT:  So what's in dispute then with respect to being subject to the MVP are the fees incurred between the 17th of December and the 23rd of January?

MR. HARRISON:  No.  The MVP provision requires prior written consent of Scottsdale, so all fees that are incurred

prior -- and our motion is limited to the time period up until January 23.

**THE COURT:** Right.

**MR. HARRISON:** That all fees incurred prior to that date, which were incurred without Scottsdale's prior written consent under the MVP provision, are non-reimbursable.

**THE COURT:** So even though they were incurred prior to December 17th --

**MR. HARRISON:** Yes.

**THE COURT:** -- even when Corthera -- I mean, what if Corthera had not known?  There was a period when it didn't know who Wiggans retained.

**MR. HARRISON:** Under the policy, Scottsdale is not responsible for those expenses.

**THE COURT:** Well, isn't there an argument that it's sort of involuntary at that point?  If the insured didn't know and had no way to inform and fulfill its duty to start the clock running --

**MR. HARRISON:** Well, I think the insured did have -- they could have taken steps to insure that they had notice as soon as Mr. Wiggans had retained counsel.

**MR. OSIAS:** Well, so could Scottsdale, by the way. Scottsdale was involved in this case.  This is not -- you know, Mr. Wiggans was added as a late defendant.  This goes to the point that Scottsdale was on notice, these are post-tender

defense costs.

They're claiming -- they're talking out of both sides of their mouth.  Scottsdale is saying on the one hand they have an obligation, a right and duty to defend, and on the other they're saying, *well, we're going to let them -- we were relying on you to tell us when everything was happening in the case*.

And to get back to the point about --

THE COURT:  Wait.  So you're saying Scottsdale should have known itself?

MR. OSIAS:  Well, sure.  They say they have an obligation -- they have a right and duty to defend, which they deferred to us because, you know, out of the kindness of their heart.  They deferred to us to allow us to pick counsel of our choosing to see if we could come together on some mutually agreeable person or lawyer or counsel.  But they are arguing in their papers that they had the obligation to step in and defend from the getgo, which they agreed to forego to allow us the opportunity -- and us, by "us" I mean Mr. Wiggans -- the opportunity to select counsel of his own choosing.

THE COURT:  Well, when did it become evident that Mr. Wiggans was going to have to select his own counsel?

MR. OSIAS:  Well, that was known all throughout.

MR. HARRISON:  No, that's not true.

MR. OSIAS:  Wait.  Hold on.  That was known all

throughout.  All the correspondence was between Corthera and Scottsdale.  Mr. Wiggans never contacted Scottsdale directly. They knew the other directors were being indemnified, and they knew that Mr. Wiggans would request indemnification and was requesting indemnification.  Mr. Wiggans was in the same situation as the others, except that Hogan could not represent Mr. Wiggans.

THE COURT:  So when is the first time that Scottsdale was informed that Wiggans was going to have the right to obtain his own counsel and indemnify?

MR. OSIAS:  Well, they should have known immediately when the complaint was amended to add Mr. Wiggans, and if I may, it's -- he said it's flat out false that we agreed to indemnify on February 20th.  That is not correct.  Our counsel, our outside counsel at Kaye Scholer, Corthera's outside counsel, did a review and wrote a letter on February 20th to Wilson, Sonsini in response to the December 17th letter agreeing to indemnify.  Prior to that there was no commitment to indemnify.

What he's referring -- what Mr. Harrison is referring to is the colloquy with Hogan Lovells, an informal colloquy to determine who would be representing Mr. Wiggans, because that's an obvious decision point, who is going to represent Mr. Wiggans.  He's coming in as a director, similar to the other directors, Peter Breining, who had already been

represented by Hogan, of which Scottsdale was aware.

And they knew all along that Mr. Wiggans was going to be indemnified by Corthera.  All the communications --

**THE COURT:**  Give me a specific piece of communication that informed Scottsdale that Mr. Wiggans was going to be -- going to require his own counsel?

**MR. OSIAS:**  Well, if I may look, Your Honor.  I don't -- I know the general circumstances are that Mr. Wiggans was coming in, and he was going to be in the same -- Mr. Wiggans never contacted -- Mr. Wiggans never contacted Scottsdale.  There was no communication --

**THE COURT:**  I'm not saying Mr. Wiggans, I'm saying when was Scottsdale first informed, whether by Corthera or Wiggans or anybody else, that Wiggans was going to require --

**MR. OSIAS:**  Well, for example, Hogan, Hogan was communicating with -- hogan, Lovells was communicating with Corthera about who would represent Mr. Wiggans, and at that point in time Scottsdale was already, you know, I presume monitoring the case, and it was on notice.  It was on notice of the case.

**THE COURT:**  So through Hogan, who was the retained counsel for Corthera, or for whom?

**MR. OSIAS:**  No, not for Corthera, for the other director.

**MR. HARRISON:**  Hogan, Lovells represented Abel and

Breining, Your Honor, and they had been representing them for a period of time.  Wiggans was not added to the action until the First Amended Complaint, which was filed at the end of October of 2013.

MR. OSIAS:  Your Honor --

MR. HARRISON:  It was immediately after that that Hogan, Lovells' counsel on behalf of Mr. Wiggans wrote to Corthera's counsel and said Mr. Wiggans is making the same indemnification request as Mr. Abel and Mr. Breining had made. And then it was ten days later, that November 11th date, that Corthera's counsel wrote back and said that quote I made earlier, that it can and will agree to indemnify Wiggans on the same terms as it is indemnifying the other officers and directors.

THE COURT:  Right.

MR. HARRISON:  That information was not shared with Scottsdale until later.  What happened is Scottsdale wrote, on December 9th, 2013, to Corthera and basically their Reservation of Rights letter in which they asked for additional information with respect to the defense arrangement.  They were aware of the fact that a favorable defense arrangement had been put in place with respect to Abel and Breining, because they were being represented along with the other defendants in the case, and the fees were being allocated across six different defendants resulting in only about 5 percent of the defense

costs being apportioned to the two insureds, Abel and Breining. Because that defense arrangement was favorable to both the insured Corthera and the insurer Scottsdale, Scottsdale was willing to consider that.  And when they wrote on December 9th of 2013, they asked Corthera *is Mr. Wiggans going to be represented by Hogan Lovells under the same -- and if so what are the arrangements for that*.  And they also asked some additional questions, such as if more defendants are added how is that arrangement going to be handled?  It was that letter that triggered Corthera to advise, on December 19th, and for the first time sharing the information that November 11th, 2013 agreement to indemnify Mr. Wiggans where they advised Scottsdale for some undisclosed conflict Hogan, Lovells was not going to be able to represent Mr. Wiggans.

**THE COURT:**  And that was on December when?

**MR. HARRISON:**  That was December 19.

**MR. OSIAS:**  December 19th, Your Honor, and that's in our brief, on page 6 of our brief.

**MR. HARRISON:**  Right.  And then they said -- Corthera said to Scottsdale:  *We will notify you as soon as it is determined, as soon as it is determined who is going to represent Mr. Wiggans*.  And as our papers say, Scottsdale was willing to give consideration to that, see if the same favorable defense arrangement could be reached as was in place with respect to Hogan, Lovells representing Abel and Breining.

**MR. OSIAS:**  Well, there was no way for the same favorable defense arrangement to be reached, because Hogan was representing multiple parties and Mr. Wiggans couldn't be represented by Hogan, so his cost would have to be borne completely on --

**THE COURT:**  Well, all right.  So now you're saying that Scottsdale is supposed to figure all this out and therefore they're not entitled to any notice.

**MR. OSIAS:**  No, I'm not saying that, Your Honor.

**THE COURT:**  All right.  I don't see what the problem is.  Why not inform Scottsdale as soon as possible?

**MR. OSIAS:**  I don't know exactly what happened.  There hasn't been discovery.  I think that it was around the Christmas holiday, and I don't know exactly what happened and why, but I do think it's irrelevant.  I think that it's irrelevant, because I think Scottsdale knew that Mr. Wiggans would be indemnified, and even if we had the same -- we'd be in the same exact position that we're in under these circumstances.  I'm not going to talk about other circumstances or other --

**THE COURT:**  So you're supposed to assess the applicability of an MVP provision by what happened after the event, look at the behavior of the parties and say, well, the behavior would have been the same anyway.

**MR. OSIAS:**  Well, it certainly would.  As soon as they

found out -- the only time they objected is when they got the bill.

But, again, I think that the -- they agreed to indemnify. They agreed to indemnify on February 20th, that's when Corthera said, *okay, we're going to indemnify*, it's February 20th, and that was after Scottsdale was on notice.

**THE COURT:**  All right.  I'm going to take it under submission.  And I understand the bad faith and the punitive damages provision.  I've got other cases to deal with.

**MR. OSIAS:**  Thank you, Your Honor.

**THE COURT:**  As far as the CMC goes, obviously, you know, you'll want a ruling on this issue.

Let me ask about -- there's some discussion here about protective order.  Is there a problem with the protective order?

**MR. HARRISON:**  No, your Honor.  That has been resolved.

**THE COURT:**  All right.  Great.  The case did not resolve in mediation.  Let me ask if there are any other -- what's the next step in terms of possible ADR here?

**MR. HARRISON:**  Your Honor, we continue to have discussions on the topic of settlement.  Obviously, they haven't been real productive or we wouldn't be here right now. But I think, at least from Scottsdale's point of view, we're open, and we'll continue to have dialogue on that issue.

I think myself and Mr. Osias are working effectively to communicate our client's respective positions.  I'm not sure that a mediator or a third party would help us move us along, but I'd be open to hearing either from the Court or Mr. Osias on that.

THE COURT:  All right.  Any thoughts about whether something else could be done in terms of facilitating any further settlement discussions?

MR. OSIAS:  I agree with Mr. Harrison, it has been discussed.  We have discussed it, and we've exchanged offers most recently, and I think that's proceeding slowly.  But we will continue with that process.  I'm not sure that mediation would be anymore effective.

THE COURT:  Well, and in terms of discovery that is ongoing --

MR. HARRISON:  Your Honor -- sorry.

THE COURT:  Go ahead.

MR. HARRISON:  I think at least with respect to the written discovery, I think we've completed at least whatever was served and propounded and responded to at this point.  The next step would be to take depositions and prepare for trial, and to the extent we would need experts, you know, prepare expert reports and move forward with the expert discovery.

Whether or not any further written -- I don't know if any written discovery, further written discovery would be necessary

at this point.

THE COURT:  What's your --

MR. OSIAS:  I would agree with that, Your Honor.

THE COURT:  Well, let's see.  Now I'm a little confused on what our trial date is here.

THE CLERK:  We haven't set one.

MR. OSIAS:  Yeah, it's to be decided.

THE CLERK:  We were going to set it today.

THE COURT:  We had one.

MR. HARRISON:  That's correct.  We bumped it so we could have the cross motions.

THE COURT:  All right.  Then we definitely want to get a trial date on calendar at this point, it seems to me.

MR. HARRISON:  Six months.

THE COURT:  Well, based on my calendar, I can offer you -- this is the best we have, Betty, right here?

(off the record discussion.)

THE COURT:  All right.  Well, unfortunately, the best I can do is December 5th of this year.  I've got a large criminal case that's going to take up the entire fall and into the winter.  And what I'll do is get out a new scheduling order just like the old one but with new dates and corresponding dates, but I did want to get that on.

And if you do want to, for instance, employ whether it's court-sponsored mediation or magistrate judge settlement

conference, please let me know, and we can certainly make that available to you.

**MR. HARRISON:**  We'll do that.

**THE COURT:**  Otherwise we'll proceed.

I'm going to take the matter that we've just argued under submission, get out a ruling.  And at this point discovery is under way, and under this schedule you'll have until the first part of June to complete discovery.

**MR. OSIAS:**  Okay.  Thank you, Your Honor.

**THE COURT:**  All right.

**MR. HARRISON:**  Thank you, Your Honor.

(Proceedings adjourned at 3:12 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, February 11, 2016

_____

Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
Official Court Reporter